# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 08-1372

_____

United States of America,          \*
                                          \*

        Appellee,          \*
                                            \*

    v.                       \*
                                            \*

Vertis Clay,                     \*
                                          \*

        Appellant.        \*

_____

No. 08-2371

_____

Appeals from the United States
District Court for the
Eastern District of Arkansas.

United States of America,          \*
                                          \*

        Appellee,          \*
                                            \*

    v.                       \*
                                            \*

Calvin Stovall,                 \*
                                          \*

        Appellant.        \*

_____

Submitted: February 12, 2009
Filed: September 4, 2009

_____

Before RILEY, SMITH, and SHEPHERD, Circuit Judges.

_____

SMITH, Circuit Judge.

Calvin Stovall and Vertis Clay appeal their sentences imposed for various drug and firearm offenses. The district court[1] sentenced Stovall to life imprisonment after he pleaded guilty to conspiracy to possess and distribute at least 100 kilograms of marijuana, in violation of 21 U.S.C. §§ 841(a)(1) and 846 ("Count 1").[2] Clay was tried and convicted by a jury on Count 1, as well as, conspiracy to use and discharge a firearm during and in relation to a drug trafficking crime, in violation of 18 U.S.C. § 924(c) ("Count 2") and use of a firearm to commit first-degree murder during and in relation to a drug trafficking crime, in violation of 18 U.S.C. §§ 924(j) and 1111 ("Count 4"). After the jury sentenced Clay to life imprisonment without possibility of release on Count 4, the district court imposed consecutive sentences of 40 years' imprisonment on Count 1 and ten years' imprisonment on Count 2. The district court allowed this 50-year sentence to run concurrently with Clay's life sentence.

On appeal, Stovall and Clay raise issues across most of the criminal procedural spectrum, including issues related to: (1) the plea agreement, (2) severance, (3) denial of counsel, (4) sufficiency of the evidence, (5) motion to suppress, and (6) various attacks on sentencing. After careful review of all issues raised by both parties, we affirm the district court in all respects.

---

[1]The Honorable William R. Wilson, United States District Judge for the Eastern District of Arkansas.

[2]Stovall was charged with solicitation of a crime of violence, in violation of 18 U.S.C. § 373 ("Count 3"). After Stovall pleaded guilty to Count 1, Counts 2 and 3 were dismissed.

## I. *Background*

### A. *Procedural History*

A federal grand jury returned a four-count indictment against Clay, Stovall, and Darryl Walker: Count 1 charged Clay, Stovall, and Walker with conspiracy to possess and distribute at least 100 kilograms of marijuana; Count 2 charged Clay, Stovall, and Walker with conspiracy to use and discharge a firearm during and in relation to a drug trafficking crime; Count 3 charged Stovall with solicitation of a crime of violence, in violation of 18 U.S.C. § 373; and Count 4 charged Clay and Walker with use of a firearm to commit first-degree murder during and in relation to a drug trafficking crime.

Darryl Walker pleaded guilty to Count 4. Walker's sentence was held in abeyance pending resolution of Clay's and Stovall's cases. Prior to trial, Stovall's attorney requested a continuance for health reasons. Because the continuance was unavoidable, the government moved to sever the trial and proceed to trial against Clay only. Over Clay's objections, the district court granted the government's motion to sever, and Clay's trial commenced.

Following a month-long trial, the jury returned guilty verdicts on all counts against Clay and sentenced him to life imprisonment without possibility of parole on Count 4. The court sentenced Clay to the statutory maximum of 40 years on Count 1 and the statutory maximum of ten years on Count 2 to run concurrently with Clay's life sentence.

Following Clay's trial, rather than proceeding to trial alone, Stovall pleaded guilty to Count 1. Because the plea agreement did not include an agreed recommended sentence, a sentencing hearing was scheduled. After a three-day hearing, the court sentenced Stovall to life imprisonment.

## B. *Factual History*

Stovall began distributing marijuana in Pine Bluff, Arkansas, and enlisted the help of Darryl Johnson, a lifelong friend. Stovall's supplier was a convicted marijuana trafficker, Benito Naito-Gastelum. Stovall and Naito-Gastelum agreed to smuggle marijuana from Mexico through California to Arkansas. Stovall established a front company named "Jesse Woods Mobile Homes" with commercial trucks to transport the drugs. Johnson and Stovall would obtain the title, tags, and insurance for commercial trucks that were then used to transport the marijuana from California to Arkansas. Stovall would receive the drugs on credit and make installment payments to Naito-Gastelum.

After the enterprise's drug sales improved, Stovall decided to steal a truckload of marijuana from his supplier. Stovall's scheme involved stealing the marijuana from the delivery truck and representing to Naito-Gastelum that police had seized the shipment on the highway. Johnson, Stovall's cohort, opposed the plan. Stovall proceeded with the caper nonetheless and, after stealing the truckload of drugs, abandoned the truck at a motel.

After his apparent initial success, Stovall then concocted a second plan to steal marijuana and money from Naito-Gastelum by burglarizing his stash house in Sherwood, Arkansas. Stovall and two of his accomplices broke into Naito-Gastelum's house and stole approximately 40 pounds of marijuana and over $20,000 in currency. Stovall tried to make the burglary appear as if the police had executed a search warrant at the property by placing yellow "POLICE" tape over the entrances.

But the scheme began to unravel when Johnson called Naito-Gastelum and told him that Stovall had stolen the shipment of marijuana. Attempting a coverup, Stovall asked Johnson to disappear so that Naito-Gastelum would believe that Johnson took the drugs and money. But Johnson refused and continued his communications with Naito-Gastelum, even assisting Naito-Gastelum in locating Stovall's Pine Bluff

residence. Sensing trouble from Naito-Gastelum and desiring retribution against Johnson, Stovall hired Clay to beat and rob Johnson.

At Stovall's request, in July 2003, Clay and Walker broke into Johnson's home and waited throughout the night for Johnson's return. When Johnson returned early in the morning, Clay shot him in the thigh as he entered the residence. Clay and Walker then tied Johnson's wrists to his ankles with duct tape. The two then tortured Johnson with an iron, a broom handle, and a hunting knife to force him to disclose the location of his drugs. Eventually, Clay killed Johnson by shooting him in the back of the head. Clay and Walker then loaded Johnson's clothes and shoes, sacks of frozen meat, ecstasy tablets (more formally known as methylenedioxymethamphetamine or MDMA), a pistol, and a digital scale into Clay's car.

Just over six months later, Walker was arrested on an unrelated matter and gave police a lengthy taped statement about his involvement in Johnson's murder. Walker's account was corroborated by the autopsy report, ballistics reports, the medical examiner's report, and Clay's telephone records.

Agents obtained a search warrant for Clay's residence where they found Johnson's shoes, a box of his personal possessions, and a white plastic bag of clothes. Johnson's sister identified the items as belonging to her brother. Additionally, clothes found at the residence bore laundry tags with the name of Darryl Johnson. Based on this evidence, both Clay and Stovall were arrested and charged.

## II. *Discussion*

We will address the issues that Stovall raises and then proceed to the issues that Clay raises.

## A. *Stovall—Plea Agreement*

Stovall argues that the government violated the spirit of the plea agreement by seeking a sentencing enhancement for the murder of Darryl Johnson. He also asserts

that the government violated the plea agreement because he pleaded guilty to Count 1, which did not include Johnson's murder as part of the conspiracy to distribute marijuana. We review the interpretation of a plea agreement de novo. *United States v. Parker*, 512 F.3d 1037, 1039 (8th Cir. 2008).

Stovall's plea agreement contained these stipulations:

> 5. <u>STIPULATIONS</u>: The United States and the defendant stipulate to the following:
>
> A. The parties agree on the fact that Defendant Stovall conspired with individuals including Darryl Johnson, Benito Naito-Gastelum-Gastelum, Robert Arnett, and Nicholas Mendez-Morales to distribute and possess with intent to distribute at least 100 kilograms of marijuana. Therefore, a trial is not necessary to determine guilt or innocence as to Count 1of the Fifth Superseding Indictment.
>
> B. The parties, however, disagree about the potential sentence in this matter and specifically the United States Sentencing Guidelines enhancements that may or may not be applicable. Therefore the parties request that the Court hold a sentencing hearing for both sides to present evidence regarding the application of any guideline enhancements.

In exchange for Stovall's guilty plea, the government dismissed Counts 2 and 3 pertaining to Johnson's murder. But Section 5B of the plea agreement reflects that the government disclosed its intent to pursue enhancements to his drug conviction. The agreement does not exclude Johnson's murder as a potential consideration for a Guidelines enhancement at sentencing.

The record reflects that Stovall was aware of this fact at the time he signed the plea agreement. After the plea agreement was signed, the district court, when scheduling a date for sentencing, stated, "I guess it will be litigated as to whether or not Mr. Stovall was involved with Mr. Clay in the homicide that he was involved in."

-6-

Stovall's lawyer responded, "Well, to the extent that it's allowable." The court then said, "I'll allow you to object, but I may hear evidence pertaining to that. Do you understand that?" Stovall responded, "Yes sir. I understand." This colloquy demonstrates that the court apprised Stovall that there might be sentencing ramifications for his participation in the activities leading to Johnson's death despite the language in the plea agreement.

Moreover, although Stovall's plea agreement does not explicitly identify Clay and Walker as part of the drug conspiracy to which Clay admitted participation, their acts in furtherance of that conspiracy are not necessarily excluded from consideration by the court at Stovall's sentencing. The plea agreement states that "Stovall conspired with individuals including . . . ." The list does not include the names of Clay or Walker but does not appear to be exhaustive and did not specifically exclude them. The agreement expressly leaves the application of enhancements for resolution by the district court following a sentencing hearing.

Stovall cites *United States v. Garcia* for the proposition that conditions may not be read into a plea agreement which would work a material change. 698 F.2d 31, 36 (1st Cir. 1983). In *Garcia*, the appellant agreed to plead guilty pursuant to the terms of the plea agreement. *Id.* at 35. The plea agreement stated that if the appellant cooperated, the recommendation might "include a recommendation of probation and fine." *Id.* at 35 n.3. On appeal, the government argued that the plea agreement included a requirement that the appellant pay restitution. *Id.* at 35. The First Circuit disagreed, holding that "restitution is a material condition unlikely to be left to implication." *Id.* at 36. Because that condition would work a material change to the plea agreement, the district court disallowed it. *Id.* (citing *United States v. Runck*, 601 F.2d 968, 969–70 (8th Cir. 1979)).

Unlike the appellant in *Garcia*, Stovall was aware that his sentence could be enhanced despite the dismissal of Count 2 and Count 3. He was even aware that he

could be sentenced to life imprisonment. With regard to potential punishment, Stovall affirmed at the plea hearing, "I understand that no less than ten years and life. That's what I understand."

Stovall admittedly participated in the underlying drug conspiracy including the defalcation of Naito-Gastelum. Once discovered, Johnson's duplicity, shown by his continued allegiance to Naito-Gastelum, made him a threat to that conspiracy. Johnson's murder was foreseeable as a means of furthering the conspiracy's illicit enterprise. The absence of a more explicit reference to Johnson's death as a basis for a potential sentencing enhancement did not cause the government to violate Stovall's plea agreement by later advocating for the enhancement. *See, e.g.*, *United States v. Gamez*, 301 F.3d 1138, 1148 (9th Cir. 2002) (holding that the enhancement applies even absent a factual finding that the defendant committed the murder so long as the murder was both reasonably foreseeable and in furtherance of the conspiracy). The district court found that Stovall was involved in the Johnson murder and that this murder furthered the conspiracy. The government was not forbidden by the plea agreement to seek the enhanced sentence. Therefore, we hold that the government did not violate the plea agreement and that the district court did not improperly enhance Stovall's sentence.

### B. *Stovall—Severance*

Stovall next argues that the district court abused its discretion by granting the government's motion to sever. Federal Rule of Criminal Procedure 14(a) allows a court to sever a trial if either a defendant or the government can show that prejudice would result if the trials remained joined. When two or more defendants are indicted together, "there is a preference for a joint trial unless the party moving to sever can show that the benefits are outweighed by a clear likelihood of prejudice." *United States v. Boone*, 437 F.3d 829, 837 (8th Cir. 2006) (citing *Zafiro v. United States*, 506 U.S. 534, 537 (1993); *United States v. Frazier*, 280 F.3d 835, 844 (8th Cir. 2002)). The severance rules "are designed to promote economy and efficiency and to avoid

a multiplicity of trials." *Zafiro*, 506 U.S. at 540 (internal quotations and citation omitted). We have stated that "[o]nly in an unusual case will the prejudice resulting from a joint trial be substantial enough to outweigh the general efficiency of joinder." *United States v. Al-Esawi*, 560 F.3d 888, 891 (8th Cir. 2009). On appeal, we review the district court's decision to grant or deny a severance motion under an abuse of discretion standard that requires a showing of clear prejudice. *United States v. Patterson*, 140 F.3d 767, 774 (8th Cir. 1998).

Here, the parties were properly joined and the matter was set for trial. Stovall's attorney then requested a continuance, citing serious personal medical issues. The district court determined that the continuance was essential and granted Stovall's motion. Because the duration of Stovall's counsel's medical infirmity was uncertain, the district court did not immediately set a new trial date. Stovall was directed to provide the court with an update of his attorney's fitness by October 1, 2007—less than two weeks after the date of the hearing. The government then moved for a severance and requested that Clay's trial proceed as planned. Both defendants objected. In its order granting the severance, the district court stated that "justice requires severing Defendant Stovall." But the court did not explain how a "clear likelihood of prejudice" would occur to the government if the parties were tried together. *Boone*, 437 F.3d at 838.

Five days after the district court granted the severance motion, Stovall's attorney received a clean bill of health from his physician. Stovall then requested that the court reconsider its motion to sever and grant Stovall a two-day delay from the original trial date. The district court denied the motion citing the "uncertain health status" of Stovall's attorney.

On this record, we cannot say that a clear likelihood of prejudice justifying the severance of Stovall and Clay has been shown. In short, the preference for a joint trial in this case was not overcome, *id*., and we are not faced with an "unusual case" in

which the resulting prejudice outweighed the efficiency of a joint trial. *Al-Esawi*, 560 F.3d at 891. In the typical case, it is the defendants who seek severance to avoid jurors unfairly mixing evidence applicable to one defendant but not the other. This is truly the unusual case where the government seeks separate trials for codefendants. Whether in joint or separate trials, the government's burden and available evidence to establish the guilt of the two defendants remain the same. Regardless of which party seeks severance—the government or one or more of the defendants—the policy preference for joinder requires the district court to find prejudice to the moving party should the motion not be granted. No clear likelihood of prejudice to the government was established on this record.

In this case, the major concern was uncertain delay due to the medical condition of Stovall's counsel. The delay proved to be minimal. In fact, only five days after the grant of severance, Stovall's attorney represented himself to be in good health and was apparently prepared to go to trial if accommodated with a two-day delay. The district court could have waited until October 1, 2007, as it had announced, to determine the health status of Stovall's counsel and then reset the trial date (or trial dates) accordingly. But the severance was immediately granted without a corresponding inquiry into the prejudice that would result to the government if the trial were delayed for a few additional days. Judicial economy and efficiency would have been better served by a brief continuance to allow a joint trial.

But Stovall has not demonstrated how, if at all, he was prejudiced by the court's grant of the government's severance motion. Even if the district court abused its discretion in granting the severance motion, Stovall has not shown that the error compromised his defense in any meaningful respect. We therefore conclude that any error on the part of the district court in granting the government's severance motion was harmless. *See, e.g.*, *United States v. Bostic*, 713 F.2d 401, 404 (8th Cir. 1983) (concluding that failure to grant a severance amounted to harmless error and did not warrant a new trial).

## C. *Stovall—Denial of Counsel*

Stovall also argues that he was denied counsel because evidence from Clay's trial was submitted without adequate lead time before Stovall's sentencing hearing. He contends that because the 24 volumes of transcripts and exhibits from Clay's trial were introduced only one week before sentencing, he was constructively denied counsel. Stovall argues that even competent counsel could not have provided effective assistance and that prejudice should be presumed.

Stovall cites *United States v. Cronic*, 466 U.S. 648 (1984), for the proposition that structural constitutional error can occur when an accused is denied counsel at a critical stage of the proceeding. This proposition, although true in principle, has no impact on Stovall's case because he has not shown that a denial of counsel actually occurred. *Cronic* involved a criminal defendant in a complex fraud case whose appointed counsel was an inexperienced civil attorney. *Id.* at 649. The defendant's counsel was given only 25 days to prepare for trial, which involved the review of thousands of pages of documentary evidence. *Id.* Nonetheless, the Court held that "[t]his case is not one in which the surrounding circumstances make it unlikely that the defendant could have received the effective assistance of counsel." *Id.* at 666. The Court contrasted the defendant's case with that of the defendants in *Powell v. Alabama*, 287 U.S. 45 (1932), who had indeed been denied counsel because their attorney was named on the day of trial in a capital case. Stovall's case is much more akin to the defendant in *Cronic* than to the defendants in *Powell*.

Stovall was represented by counsel at all phases of his prosecution. It was less than optimal to have counsel burdened with a difficult document review task prior to sentencing. Nonetheless, Stovall has made no convincing argument based on the record or cited any controlling authority that the district court's admission of a large quantity of documentary evidence a week before his sentencing hearing constituted a complete denial of counsel.

Stovall also argues that one week to review 24 volumes from Clay's trial constituted insufficient notice under Federal Rule of Criminal Procedure 32. He argues that this short time frame allowed him an inadequate opportunity to comment on the factual information on which his sentence was based. Stovall seems to argue that Rule 32(c)(1) was violated, citing *United States v. Nappi*, 243 F.3d 758 (3d Cir. 2001), as support. But *Nappi* involved a defendant who had not received a copy of the presentence investigation report (PSR) prior to sentencing. *Id*. at 760. The defendant did not object at the time of sentencing, and the court ultimately upheld the sentence on plain error review. *Id*. In contrast, Stovall received his PSR before sentencing and has not alleged that he did not receive it within the time frame prescribed by Rule 32(e)(2).[3] He instead argues that the transcript from Clay's trial made preparing for a sentencing hearing essentially impossible. We disagree. The PSR itself put Stovall on notice of the factual allegations upon which his sentence recommendation would be based. It was not necessary to review the entire Clay transcript in order to address the facts alleged in the PSR. In fact, Stovall made only two objections to the PSR—one pertaining to the enhancement for leadership role and the other based on the application of a § 2D1.1(d)(1) cross reference. He does not state what evidence was admitted based on the Clay transcript that unfairly prejudiced him that would have been meaningfully disputed had he had more time to prepare. Stovall mentions that the court denied his request to subpoena witnesses to refute the evidence as untimely but did not appeal that ruling.

Although the government appears, as the saying goes, to have "had its cake" (severed trial) and "eaten it too" (admission of co-defendant's trial transcript in sentencing), Stovall has fallen short in both fact and legal authority of showing that

---

[3]Federal Rule of Criminal Procedure 32(e)(2) provides that "[t]he probation officer must give the presentence report to the defendant, the defendant's attorney, and an attorney for the government at least 35 days before sentencing unless the defendant waives this minimum period."

the district court committed reversible error in applying Rule 32.We conclude Stovall's conclusory argument of inadequate notice is unavailing on this record.

### D. *Stovall—Sentencing*

Finally, Stovall argues that his sentence violates the Due Process Clause of the Fourteenth Amendment and is substantively unreasonable. We review the district court's interpretation of the Guidelines under a de novo standard. *United States v. Vickers*, 528 F.3d 1116, 1120 (8th Cir. 2008). We review the substantive reasonableness of the sentence for abuse of discretion. *United States v. Saddler*, 538 F.3d 879, 890 (8th Cir. 2008).

### 1. *Due Process*

Stovall argues that applying the cross reference in U.S.S.G. § 2D1.1(d) regarding the murder of Darryl Johnson violated his due process rights. Stovall contends that "the government avoided its burden to prove the elements of the crime they actually sought to punish, and relegated the same to a mere sentencing factor to obtain the punishment for a murder they could not otherwise prove." He argues that his sentence should not have been enhanced for Johnson's murder unless the government could prove the murder beyond a reasonable doubt, or at least by clear and convincing evidence. He characterizes the application of the enhancement as the "tail wagging the dog" because the punishment for the enhancement exceeds the punishment for the underlying crime of conviction. But we have recently held that "due process never requires applying the clear and convincing evidence standard to judicial fact-finding at criminal sentencing." *United States v. Villareal-Amarillas*, 562 F.3d 892, 897 (8th Cir. 2009). So long as the factor considered by the court is not an element of the offense charged, the sentencing factor may be proven by a preponderance of the evidence. *Id.*

Here, the district court sentenced Stovall for a narcotics offense under § 2D1.1. Section 2D1.1(d) contains a cross reference that is applied when a victim is killed

under circumstances that would constitute murder under 18 U.S.C. § 1111. The district court, applying principles of accomplice liability from Guidelines § 1B1.3, found Stovall responsible for the Johnson murder by a preponderance of the evidence and applied the § 2D1.1(d) cross reference. The cross reference directs the sentencing court to U.S.S.G. § 2A1.1, the Guideline section for homicide. The government contends that it did not have to prove that Stovall solicited Johnson's murder but only prove that the murder was a reasonably foreseeable act in relation to the Stovall drug enterprise. We agree and hold that the district court's application of § 2D1.1(d) did not violate Stovall's due process rights.

## 2. *Reasonableness*

Stovall makes numerous arguments attacking the overall reasonableness of his life sentence. We review the substantive reasonableness of the sentence for an abuse of discretion. *Saddler*, 538 F.3d at 890. A district court abuses its discretion when it fails to consider a significant relevant factor, gives significance to an improper or irrelevant factor, or considers proper factors, but in weighing the factors commits a clear error of judgment. *Id*.

Essentially, Stovall asserts that the district court improperly weighed Johnson's murder in assessing his sentence. But we have already held that the district court could consider the murder in sentencing Stovall because the murder was a reasonably foreseeable result of Stovall's drug conspiracy. *See supra* Parts II.A. and II.D.1. The ultimate inquiry on appeal is whether the district court considered the Guidelines advisory and properly weighed the 18 U.S.C. § 3553(a) factors. *Saddler*, 538 F.3d at 889. Here, the district court noted its intention to weigh the § 3553(a) factors at the beginning of sentencing. Moreover, there is no indication that the district court treated the Guidelines as mandatory. Based on Stovall's plea statement referencing the drug conspiracy and the brutal murder of Johnson—a foreseeable act in furtherance of the drug conspiracy—the district court did not abuse its discretion in sentencing Stovall to life imprisonment, a sentence within the properly calculated Guidelines range.

## E. *Clay—Sufficiency of the Evidence*

Clay first argues that insufficient evidence exists to sustain his convictions for conspiracy to possess and distribute marijuana, conspiracy to use and discharge a firearm during and in relation to a drug trafficking crime, and use of a firearm to commit first-degree murder during and in relation to a drug trafficking crime. On a claim of sufficiency of the evidence, we "review the evidence in the light most favorable to the verdict, and reverse only if no reasonable jury could have found the appellant guilty beyond a reasonable doubt." *United States v. Ireland*, 62 F.3d 227, 230 (8th Cir. 1995). "A defendant challenging the sufficiency of the evidence in a conspiracy case has a heavy burden." *United States v. Nolen*, 536 F.3d 834, 842 (8th Cir. 2008) (internal quotations, alteration, and citation omitted).

Clay argues that he was not part of the conspiracy to distribute marijuana and that Johnson's murder actually frustrated the conspiracy rather than furthered it. To prove conspiracy, the government must prove each of the following elements beyond a reasonable doubt: (1) the existence of a conspiracy; (2) the defendant's awareness of the conspiracy; and (3) the defendant's intentional decision to join the conspiracy. *Id*.

Clay does not argue he was not a part of a marijuana conspiracy; he merely argues that Johnson's murder was a separate conspiracy to which he was not a member. Whether Johnson's murder was a separate conspiracy or furthered the purpose of a single conspiracy is a question of fact to be resolved by the jury. *United States v. England*, 966 F.2d 403, 406 (8th Cir. 1992). The jury in Clay's trial heard evidence that Clay was used as an "enforcer" to help Stovall further his drug trafficking activities. The jury heard testimony consistent with Clay murdering Johnson to help Stovall, a leader in the drug conspiracy, continue his business relationship with the Mexican drug cartel. Based on this information, the jury could reasonably believe the government's theory over Clay's theory.

-15-

There was also testimony presented to the jury that Clay told Walker that he was employed as an enforcer for Stovall, whom he described as a major drug dealer. In his role as enforcer, Clay purportedly ensured that all of Stovall's debts were collected. In carrying out his job as conspiracy enforcer, which included murdering Johnson, it is immaterial whether Clay knew all of the details of the conspiracy, so long as he knew that he was contributing to the furtherance of the conspiracy—namely, Stovall's drug trafficking business. *See United States v. Massa*, 740 F.2d 629, 636 (8th Cir. 1984) (holding that a conspirator need not know all the details of the conspiracy as long as the evidence shows a knowing contribution in furthering the conspiracy).

Here, the evidence was sufficient for a reasonable jury to have found that a conspiracy existed, determined that Clay was aware of this conspiracy, and concluded that Clay joined the conspiracy to help Stovall's drug trafficking business. Moreover, it was reasonable for the jury to believe that Johnson's murder furthered the common purpose of the conspiracy. Therefore, we conclude that there was sufficient evidence that Clay was a part of the conspiracy.

## F. *Clay—Motion to Suppress*

Clay next argues that the district court erred in denying his motion to suppress because the search of his home violated the Fourth Amendment. In reviewing a denial of a motion to suppress, the factual findings are reviewed for clear error and the legal conclusions are reviewed de novo. *United States v. Taylor*, 519 F.3d 832, 833 (8th Cir. 2008).

Officers received a warrant to search Clay's residence for controlled substances, contraband, or other evidence related to the conspiracy. Nine months earlier, Drug Enforcement Administration Special Agent Karen Fehrenbach interviewed Darryl Johnson's sister after Johnson was murdered. Johnson's sister described to Agent Fehrenbach certain items of clothing that were missing from Johnson's house after the

murder. Upon searching Clay's house, Fehrenbach found certain items associated with Johnson and described by Johnson's sister, including a black velour jumpsuit, blue alligator shoes, a tennis shoe box container, and several leather jackets.

Clay argues that his Fourth Amendment rights were violated because these items were not specifically listed in the search warrant. If an item not particularly described in the warrant is seized, it must fall within an exception to the Fourth Amendment's warrant requirement. *United States v. Criswell*, 696 F.2d 636, 640 (8th Cir. 1983). Here, the government sought to justify the seizure under the plain view doctrine.

To qualify under the plain view exception, the government must prove that (1) the item is in plain view; (2) the officer is lawfully located where he may view the object; and (3) the incriminating nature of the evidence is "immediately apparent." *Horton v. California*, 496 U.S. 128, 136–37 (1990). "Immediately apparent" requires that the agent have "'probable cause to associate the property with criminal activity.'" *United States v. Garner*, 907 F.2d 60, 62 (8th Cir. 1990) (quoting *Texas v. Brown*, 460 U.S. 730, 741–42 (1983)). More specifically, probable cause demands that "the facts available to a reasonably cautious man would warrant a belief that certain items may be contraband or stolen property or useful as evidence of a crime." *Id*. (internal quotations and citation omitted).

The parties dispute only the incriminating nature of the evidence. Agent Fehrenbach testified that she immediately recognized that the items observed in Clay's residence belonged to the murder victim, explaining that some of the items "jumped out" at her based on her 19 years of experience and her extensive interview with the victim's sister. The facts known to Fehrenbach would justify her belief that the items were contraband.

Clay also argues that the officers rummaged through all of the occupant's belongings without limitation, ignoring the warrant's dictates. He relies on *United States v. Clark*, 531 F.2d 928, 930 (8th Cir. 1976), for the proposition that this type of exploratory search violates the Fourth Amendment. In *Clark*, officers searched the defendant's residence with a search warrant looking for controlled substances. *Id*. at 931. Once there, the officers began to inventory all items found, including recording the serial numbers of guns and electronic equipment. *Id*. at 931–32. The district court granted the motion to suppress because the search exceeded the scope of the warrant. *Id*. at 931. On appeal, the government argued that the items fell within the plain view doctrine. *Id*. We disagreed because the incriminating nature of the items searched and seized was not immediately apparent. *Id*. at 932–33.

The circumstances of this case are distinguishable from *Clark*. The officers searching Clay's residence neither conducted an unbounded exploratory search nor recorded serial numbers of random items in the home seeking incriminating evidence of potential crimes. Furthermore, the incriminating nature of the items seized was immediately apparent to Agent Fehrenbach, who instantly connected the items to Johnson's homicide. We hold that the seizure of these items during the warrant search did not violate the Fourth Amendment and that the district court properly denied the motion to suppress.

## G. *Clay—Sentencing*

Finally, Clay argues that because he was convicted of Count 2 under 18 U.S.C. § 924(o), he was erroneously sentenced under 18 U.S.C. § 924(c). The government did not reply to this argument in its brief. Clay also challenges the overall reasonableness of his 40-year sentence. We will address each sentencing issue in turn.

### 1. *Section 924(o)*

Count 2 charged Clay with conspiracy to use and discharge a firearm during and in relation to a drug trafficking crime, in violation of § 924(o). But Clay was

sentenced under § 924(c), which provides, in relevant part, that "no term of imprisonment imposed on a person under this subsection shall run concurrently with any other term of imprisonment imposed on the person." Conversely, § 924(o) does not contain any restriction on concurrent sentencing. *See* § 924(o) (stating that a "person who conspires to commit an offense under subsection (c) shall be imprisoned for not more than 20 years"). Relying on § 924(c), the district court sentenced Clay to 40 years' imprisonment on Count 1, to run consecutively to Clay's ten-year prison sentence on Count 2.

Only the Sixth Circuit has addressed this issue. In *United States v. Stubbs*, the defendant pleaded guilty to § 924(o) but was sentenced under § 924(c). 279 F.3d 402, 405 (6th Cir. 2002), *overruled on other grounds by United States v. Helton*, 349 F.3d 295, 299 (6th Cir. 2003).[4] On appeal, the defendant argued that he was erroneously sentenced under § 924(c) when he had pleaded guilty to § 924(o). *Id.* The Sixth Circuit stated that because the statutes require different levels of proof as to conduct and *mens rea* and call for vastly different penalties, they consequently charge different offenses. *Id.* at 409. That court concluded that it was plain error for the district court to sentence the defendant under § 924(c) without charging him under that statute. *Id.*

The *Stubbs* case is factually analogous and legally persuasive. Accordingly, we conclude that the district court erred in sentencing Clay pursuant to § 924(c) because § 924(c) charges a completely different offense than § 924(o)—the offense of conviction. But we also conclude that reversal is unwarranted. In addition to the above sentences, Clay was sentenced to life imprisonment without the possibility of release on Count 4—using a firearm to commit first-degree murder during and in relation to a drug trafficking crime, in violation of 18 U.S.C. §§ 924(j) and 1111. We have already upheld the sufficiency of the evidence on this count. *See supra* Part II.E.

---

[4]*Stubbs* was overruled on a separate sentencing issue in *United States v. Helton*, 349 F.3d 295, 299 (6th Cir. 2003).

Because Clay's life without parole sentence stands as to Count 4, any sentencing error on Counts 1 and 2 constitutes harmless error. *See, e.g.*, *United States v. Blade*, 336 F.3d 754, 758 (8th Cir. 2003) (holding that any error as to sentencing on count 1 was harmless because the defendant was sentenced to life without parole on counts two through five).

### 2. *Reasonableness*

Clay also argues that his 40-year sentence imposed on Count 1—conspiracy to possess with intent to distribute marijuana—was unreasonable. He cites *United States v. Gillmore*, 497 F.3d 853, 858–59 (8th Cir. 2007), for the proposition that the district court must justify an extraordinary variance with an extraordinary or equally compelling justification. But this line of reasoning is no longer good law after the Supreme Court's decision in *Gall v. United States*, 128 S. Ct. 586 (2007). The *Gall* Court expressly rejected any "appellate rule that requires 'extraordinary' circumstances to justify a sentence outside the Guidelines range." *Id.* at 594–95; *see also United States v. Braggs*, 511 F.3d 808, 812 (8th Cir. 2008) (same).

In granting a variance, the district court only has to take into account the § 3553(a) factors and recognize that the Guidelines are not mandatory. *Gall*, 128 S. Ct. at 596–97. Here, Clay does not assert that the district court failed to take the § 3553(a) factors into account. In fact, he notes that the district court found that the safety of the public warranted an upward departure. *See* § 3553(a)(2)(C) (stating that "to protect the public from further crimes of the defendant" is a factor for the district court to consider). Clay asserts that his 40 year sentence is "615% above the high end of the sentencing guideline range." But *Gall* explicitly rejects "the use of a rigid mathematical formula that uses the percentage of a departure as the standard for determining the strength of the justifications required for a specific sentence." *Gall*, 128 S. Ct. at 595. The district court did not abuse its discretion in this regard. In any event, we note that because Clay's life sentence without parole on Count 4 will remain

unchanged, any error by the district court on Count 1 is harmless. *See supra* Part II.G.1. Therefore, Clay's sentence is affirmed.

### III. *Conclusion*

For the foregoing reasons, we affirm the district court's decision in all respects.

_____