NONPRECEDENTIAL DISPOSITION
To be cited only in accordance with
Fed. R. App. P. 32.1

# United States Court of Appeals

**For the Seventh Circuit**
**Chicago, Illinois 60604**

Submitted April 6, 2011[*]
Decided April 19, 2011

**Before**

JOEL M. FLAUM, *Circuit Judge*

DIANE P. WOOD, *Circuit Judge*

DAVID F. HAMILTON, *Circuit Judge*

Nos. 09-1480 & 09-1873

| | |
|---|---|
| UNITED STATES OF AMERICA, *Plaintiff-Appellee,* | Appeals from the United States District Court for the Southern District of Illinois. |
| *v.* | No. 08-CR-30003-WDS |
| TYRONE W. JACKSON and MADLON S. LADD, *Defendants-Appellants.* | William D. Stiehl, *Judge.* |

## O R D E R

Tyrone Jackson and Madlon Ladd sold crack in Mount Vernon, Illinois. After a jury trial they were convicted of conspiracy and substantive counts of possession and distribution. See 21 U.S.C. §§ 846, 841(a)(1). Jackson, who is *pro se*, appeals his convictions and sentence. Ladd's lawyer, on the other hand, moves to withdraw on the ground that her appeal is frivolous. See *Anders v. California*, 386 U.S. 738 (1967). We affirm the judgment against Jackson and dismiss Ladd's appeal.

---

[*]After examining the briefs and records, we have concluded that oral argument is unnecessary. Thus the appeals are submitted on the briefs and records. See FED. R. APP. P. 34(a)(2)(C).

Local police, led by Captain Ron Almaroad of the Mount Vernon Police Department, targeted Jackson and Ladd for more than two years. In November 2005, Almaroad sent informant Reginald Jones to buy crack from the duo. Jones testified that he expected to find the defendants at an apartment building where he bought from them previously. This time they were absent, so Jones summoned Jackson by telephone. While Jones waited, another dealer named Josh Liddell showed up and offered to sell him crack. Jones agreed. (At trial Almaroad testified, over a relevance objection, that Jones's initiative and later testimony led to Liddell's conviction.) When Jackson and Ladd arrived, they were angry with Liddell for siphoning their business. They also voiced displeasure with Jones for not having settled his tab for earlier buys on credit. When Jones handed $50 to Ladd, she gave him less than that amount of crack to make up for some of his debt. Jones recorded the entire encounter both on videotape and with still pictures, both of which the jury eventually saw.

Jones testified that Ladd sometimes sold crack out of a room at the Royal Inn. He passed that information to Captain Almaroad, who obtained a search warrant for Ladd's motel room in January 2006. Almaroad found Ladd with a small amount of marijuana in her purse. With her in the room she had a box of plastic baggies and 9.9 grams of crack. That amount of crack, Almaroad testified, is consistent with distribution rather than personal use. The captain also found photographs of Jackson taken at the motel, including one depicting him kneeling outside Ladd's room amid scattered cash. Two months later, in March 2006, the police again raided the Royal Inn, where they found Jackson and Ladd in a room with half a gram of crack and $870. The defendants were charged in state court following these raids and then released, but that information was not shared with the jury.

In late April 2006, Ladd rented a house on Conger Avenue. Jackson did not sign the lease, but at trial the landlord testified that Jackson sometimes paid the rent and usually was present whenever the landlord stopped at the house. In February 2007 a police officer rummaging through the pair's trash discovered marijuana and a significant number of plastic baggies, one containing crack residue. With this information Captain Almaroad secured a warrant to search the house for evidence of possession of a controlled substance. When the warrant was executed, the defendants were present with 9.4 grams of crack, 8.2 grams of marijuana, $171, and a stock of plastic baggies. They had three surveillance cameras monitoring approaches to the house. Again both were charged and then released.

Throughout this time, Jackson also was selling crack wholesale to fellow dealers. Three of them testified at trial. Dekal James said he bought roughly 3.5 grams from Jackson at least 8 times during 2006. Damian Thrailkill testified that, during that same year, he bought 3.5 grams at least 3 times. And Fred Goosby recalled buying 170 grams in 5 large purchases at the house on Conger Avenue between March 2006, when he began serving a

term of supervised release, and April 2007, when he was sent back to prison. The first time, Goosby remembered, he gave $900 to Jackson, who retreated into the house and sent Ladd out to hand over the ounce of crack. On another occasion, Goosby continued, he dropped by while Jackson and Ladd were cooking crack. Jackson was manning the stove, Goosby reported, while Ladd was packaging the product for sale.

Captain Almaroad orchestrated one more controlled buy from Jackson in October 2007. This time he sent informant Jeff McCurdy, who made a video and audio recording that was played for the jury. McCurdy met Jackson at a house on South 24th Street and gave him $50. Jackson then got in his car and, before driving away, dropped out of the window a baggie containing .4 grams of crack. This was not his first buy from Jackson, McCurdy told the jury, though usually he made his purchases at the house on Conger Avenue. Typically, he said, Jackson would tell him to put his money on a table and then Ladd would hand him the crack. But sometimes, he added, the defendants made him wait outside and slid the drugs, wrapped in toilet paper, underneath the front door.

The government charged that, from March 2005 until October 2007, Jackson and Ladd conspired to possess and distribute crack. The government also charged the defendants with distribution for sale to informant Jones in November 2005, as well as possession with intent to distribute arising from the search of the house on Conger Avenue in February 2007. In addition Jackson was charged with distributing crack to informant McCurdy in October 2007, and Ladd was charged with possession with the intent to distribute arising from the January 2006 raid on the Royal Inn. Both defendants moved unsuccessfully to suppress some items seized during the February 2007 search, arguing that the police had searched for evidence of *distribution* and thus exceeded the scope of their narrow warrant to search for evidence of simple *possession*. Then, about a month before trial, Jackson invoked his right to self-representation. The district court appointed standby counsel. In addition, invoking its "standard practice" for defendants who are detained, the court directed that Jackson remain behind a curtained table in leg restraints throughout the trial. To prevent any prejudice to Jackson, the prosecutor and Ladd's lawyer agreed to remain at their tables too. After a three-day trial, the jury found the defendants guilty on all counts and also found that their conspiracy had involved at least 5 grams of crack.

At sentencing the district court found that the conspiracy actually involved 244 grams of crack. The court reached this figure by adding up the amounts from the searches, controlled buys, and wholesale purchases made by the dealers who testified at trial. And since Jackson already had a state conviction for a felony drug offense, see 720 ILCS 570/402(c), the quantity of crack mandated a minimum prison sentence of 20 years, see 21 U.S.C. § 841(b)(1)(A)(iii) (2006). After permitting Jackson to allocute for over an hour, the

court sentenced him to the 20-year minimum term. Ladd's offense level of 32, see U.S.S.G. § 2D1.1(c)(4) (2008), and Category I criminal history yielded an imprisonment range of 121 to 151 months. Ladd cited her tragic past and insisted that a manipulative and controlling Jackson had seduced her into a life of crime, but the court reasoned that she was nevertheless guilty of a very serious offense and accordingly sentenced her to 144 months.

On appeal Jackson first argues that shackling his legs throughout trial violated his right to due process. He relies on *Deck v. Missouri*, 544 U.S. 622, 629 (2005), which forbids visible restraints unless the trial judge finds them "justified by a state interest specific to a particular trial." The district court invoked a blanket policy instead of identifying a need specific to Jackson, and Jackson argues that the restraints hampered his presentation to the jury. The government, after seeing this claim in Jackson's brief, asked the district court to approve, and include in the record, a statement from the prosecutor describing the measures taken to prevent jurors from seeing Jackson's restraints. See FED. R. APP. P. 10(e)(2)(B). The court instead drafted its own statement recounting that jurors had not been present when Jackson was moved in and out of the courtroom, that skirting had been draped around the tables used by both parties, and that Jackson's shackles had not been exposed to the jury since he questioned witnesses from his table.[1]

Because Jackson's leg restraints were not visible to the jury, we conclude on the record before us that his right to due process was not violated. In *Deck* the Supreme Court addressed only the question whether *visible* physical restraints offend the Constitution. 544

---

[1] Jackson disputes the accuracy of the district court's recollection and has filed two motions asking us to strike from the government's brief all references to the court's supplemental finding. We decline that request. Rule 10(e) promotes accuracy in appellate records, *United States v. Elizalde-Adame*, 262 F.3d 637, 641 (7th Cir. 2001), and we allow supplemental material that offers useful context, *Coleman v. Hardy*, 628 F.3d 314, 315 n.1 (7th Cir. 2010). The court's statement in this case is especially helpful because it illuminates the crucial factual issue whether Jackson was encumbered by *visible* restraints. And though Jackson challenges the accuracy of the court's statement, Rule 10(e)(1) specifically commits to the district court the task of settling disagreements between the parties about what transpired. We will not reject the district court's reconstruction of the record unless it is intentionally falsified or plainly unreasonable. *United States v. Franklin*, 250 F.3d 653, 663 (8th Cir. 2001); *United States v. Zichettello*, 208 F.3d 72, 93 (2d Cir. 2000); *United States v. Keskey*, 863 F.2d 474, 478 (7th Cir. 1988). Jackson has not come close to demonstrating either of these infirmities. Significantly, while he mounts a general attack on the district court's supplemental finding, he never has asserted that the parties' tables were *not* skirted or that, in fact, he moved around the courtroom to question witnesses.

U.S. at 626-29. Jackson's physical restraints, on the other hand, remained at all times hidden from the jury's view behind a skirted table. See *United States v. Cooper*, 591 F.3d 582, 588-89 (7th Cir.) (concluding that restraining defendant with shackles concealed from view by skirted table did not constitute "clear or obvious violation" of due process), *cert. denied*, 130 S. Ct. 3530 (2010); *United States v. Baker*, 432 F.3d 1189, 1245-46 (11th Cir. 2005) (concluding that district court's failure to justify shackling defendants was not abuse of discretion where, among other things, shackles were not visible to jurors). We have no need here to decide whether the court's adoption of a "general policy" of shackling is problematic, as we can see no prejudice to Jackson on these facts.

Nor does the record suggest that his leg restraints impeded Jackson's right under *Faretta v. California*, 422 U.S. 806 (1975), to represent himself. *Cf. Oses v. Massachusetts*, 961 F.2d 985, 986 (1st Cir. 1992) (holding that district court violated defendant's right to self-representation by refusing to permit shackled defendant to participate in bench conferences); *Spain v. Rushen*, 883 F.2d 712, 720 (9th Cir. 1989) (suggesting that shackles "may confuse and embarrass the defendant, thereby impairing his mental faculties"). Like Jackson, the government's lawyer sat at a table draped by a skirt, and to ensure that jurors did not draw an adverse inference from seeing only Jackson remain behind his table, the district court directed the government's lawyer to do the same. These accommodations kept the leg restraints from undercutting the jurors' perception that Jackson was his own lawyer. See *Frantz v. Hazey*, 533 F.3d 724, 728 (9th Cir. 2008) (en banc); *Overton v. Mathes*, 425 F.3d 518, 521 (8th Cir. 2005). And Jackson's advocacy, for someone without legal training, was sharp and focused; the record belies his suggestion on appeal that the restraints thwarted him from pressing his case to the utmost of his ability. See *Cooper*, 591 F.3d at 587 (explaining that district court need not discuss shackling with defendant before permitting self-representation).

Jackson also argues that he is entitled to a new trial because, he asserts, the government knowingly presented false testimony. Jackson did not raise this contention in the district court, so our review is for plain error. See *United States v. Williams*, 547 F.3d 1187, 1202 n.13 (9th Cir. 2008); *United States v. Peak*, 856 F.2d 825, 830-31 (7th Cir. 1988). He points to Goosby's testimony that he bought crack from the defendants at the house on Conger Avenue beginning in March 2006. That is not possible, Jackson insists, because, as the landlord testified, Ladd did not rent that house until the end of April. But inconsistencies in a witness's testimony do not establish that the government suborned perjury. *United States v. Ogle*, 425 F.3d 471, 477 (7th Cir. 2005); *United States v. Griffin*, 194 F.3d 808, 818-19 (7th Cir. 1999). Goosby was testifying in July 2008 about events more than two years old, and what Jackson calls perjury just as easily could be chalked up to faulty memory. Jackson vigorously cross-examined Goosby and drew the jury's attention to the conflict between his testimony

and that of the landlord. We have not been given a reason to suspect that Goosby was lying or that the prosecutor knew he was lying, see *Martin v. Evans*, 384 F.3d 848, 855 (7th Cir. 2004); *United States v. Magana*, 118 F.3d 1173, 1191 (7th Cir. 1997), and thus Goosby's credibility was for the jury alone to decide.

Jackson next focuses on two evidentiary rulings. He insists that the district court should have allowed him to question Captain Almaroad about a scheme allegedly hatched with two state judges to "persecute" Jackson in retaliation for exposing one of the judges' crack addiction. This line of questioning is precisely the sort of inflammatory and, at best, marginally relevant interrogation that a trial judge may forbid without violating a defendant's right of confrontation. See *Delaware v. Van Arsdall*, 475 U.S. 673, 679 (1986); *United States v. Saunders*, 166 F.3d 907, 918-20 (7th Cir. 1999). Jackson also contends that the judge should have excluded the evidence that Jones, the first informant, bought crack from Liddell just before the defendants arrived to make their own sale. But we do not understand how Jackson could have been harmed by the jury's viewing Jones's fortuitous deal with Liddell, and so we suspect that Jackson's real complaint is with the admission of Almaroad's statement that Jones later testified against Liddell and helped get him convicted. Heralding Jones's service to the government lent official credibility to his testimony and thus was impermissible bolstering, see *United States v. Vázquez-Botet*, 532 F.3d 37, 53 (1st Cir. 2008); *United States v. Thomas*, 510 F.3d 714, 724 (7th Cir. 2007), irrelevant to the jury's evaluation of the charges against the defendants. The error was harmless, however, because the improper snippet about Jones's role in Liddell's conviction pales in comparison to the videos of the defendants' drug sales and the testimony of three of their wholesale customers. See *United States v. Taylor*, 522 F.3d 731, 735 (7th Cir. 2008); *United States v. Davis*, 838 F.2d 909, 919-20 (7th Cir. 1988).

Moving on to sentencing, Jackson argues that his statutory minimum term of imprisonment was doubled on the basis of a conviction that, he insists, does not constitute a felony drug offense. In 1996, Jackson concedes, he was convicted of possessing less than 15 grams of crack, see 720 ILCS 570/402(c), which under Illinois law is a Class 4 felony punishable by up to 3 years' imprisonment, see 730 ILCS 5/5-4.5-45(a). For purposes of 21 U.S.C. § 841(b)(1), any "offense that is punishable by imprisonment for more than one year under any law of the United States or of a State or foreign country that prohibits or restricts conduct relating to narcotic drugs, marihuana, anabolic steroids, or depressant or stimulant substances" qualifies as a "felony drug offense." 21 U.S.C. § 802(44). Jackson's state conviction falls squarely within this definition. See *Burgess v. United States*, 553 U.S. 124, 129-33 (2008); *United States v. Arango-Montoya*, 61 F.3d 1331, 1333 (7th Cir. 1995).

Jackson also accuses the government of inflating his sentence with "ghost dope"—that is, a quantity of crack that was not proved to the jury beyond a reasonable doubt. His 20-year sentence is the statutory minimum, however, and there is no constitutional requirement that a jury, rather than the sentencing judge, determine a drug quantity that affects only the minimum sentence. *Harris v. United States*, 536 U.S. 545, 557 (2002); *United States v. Collins*, 510 F.3d 697, 701 (7th Cir. 2007).

Finally, Jackson urges us to resolve the question we left open in *United States v. Washington*, 558 F.3d 716, 720 (7th Cir. 2009), and decide whether 21 U.S.C. § 841(b)(1) requires a sentencing court to " 'apply both the statutory maximum and the statutory minimum that corresponds to the drug quantity found by the jury.' " For Jackson the statutory penalties were increased under all circumstances because of his prior conviction. The district court properly applied § 841(b)(1)(B)(iii) in determining that the statutory maximum was life imprisonment given the jury's finding that the defendants had conspired to distribute at least 5 grams of crack. (That subsection since has been amended to apply only to crimes involving at least 28 grams of crack.) But the court, adopting what we termed in *Washington* a "mix-and-match approach," 558 F.3d at 720, determined Jackson's statutory *minimum* not by looking back to § 841(b)(1)(B), which provides a corresponding minimum sentence of 10 years' imprisonment, but instead by looking to § 841(b)(1)(A)(iii). That subsection, at the time, mandated a 20-year minimum for a recidivist convicted of an offense involving at least 50 grams of crack. The court turned to § 841(b)(1)(A) because of its finding, by a preponderance of the evidence, that the conspiracy involved 244 grams of crack. The fatal flaw in Jackson's argument, however, is that he did not voice to the district court his contention that the statute forbids this "mix-and-match approach." Thus we review the issue for plain error, and since the question remains unsettled, the district court's "mix-and-match approach," whether or not correct under § 841(b)(1), cannot be *plain* error. See *United States v. Gibson*, 530 F.3d 606, 612 (7th Cir. 2008); *United States v. Liddell*, 543 F.3d 877, 885 (7th Cir. 2008).

We turn now to Ladd. Her appointed lawyer first ponders whether to challenge the denial of Ladd's motion to suppress the cash, plastic baggies, and security cameras recovered from the house on Conger Avenue. These items were seized pursuant to a warrant that authorized a search for evidence of *possession* of a controlled substance, and in the district court Ladd conceded that the affidavit supporting the warrant established probable cause to believe that a possession offense was committed at the residence. She also conceded that the drugs were admissible but insisted that the other items were evidence not of drug possession but rather of distribution.

It is quite a stretch to imagine how suppressing this evidence could have changed the outcome of Ladd's trial. But regardless, we agree with counsel that it would be frivolous to resurrect the matter on appeal because we would find that the items were admissible under the plain-view doctrine. The disputed evidence was seized by officers authorized to be inside the house, and while the items may not be evidence of the crime of *possession*, the officers were not limited to that offense or to the facts disclosed in the affidavit when evaluating whether to seize evidence or contraband discovered in plain view. See *United States v. Clay*, 579 F.3d 919, 931-32 (8th Cir. 2009), *cert. denied*, 130 S. Ct. 3353 (2010); *United States v. Armstrong*, 554 F.3d 1159, 1163 (8th Cir. 2009); *United States v. Cooper*, 19 F.3d 1154, 1163 (7th Cir. 1994). Given what Captain Almaroad already knew about Jackson and Ladd before he executed the search warrant, and given what he uncovered lawfully while searching for evidence of drug possession, we would conclude that the incriminating character of the disputed items was immediately apparent.

Even less need be said about the other possible arguments identified by counsel. In light of the overwhelming evidence that the defendants worked as a team to peddle crack, it would be frivolous indeed to argue that no rational jury could have found Ladd guilty. See *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *United States v. Hanna*, 630 F.3d 505, 508 (7th Cir. 2010). As for Ladd's overall term of imprisonment, we agree with counsel that, because the district court carefully listened to her arguments in mitigation and thoughtfully applied the factors in 18 U.S.C. § 3553(a) to her case, it would be frivolous to try to overcome the presumption of reasonableness that attaches on appeal to a sentence within the guidelines range. See *Rita v. United States*, 551 U.S. 338, 347 (2007); *United States v. Vallar*, No. 07-3641, 2011 WL 488877, at *3 (7th Cir. Feb. 14, 2011).

We AFFIRM the judgment in appeal number 09-1480. We GRANT counsel's motion to withdraw and DISMISS appeal number 09-1873.