In the

# United States Court of Appeals

## For the Seventh Circuit

No. 08-4021

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

KEVIN M. COOPER,

*Defendant-Appellant.*

Appeal from the United States District Court
for the Southern District of Illinois.
No. 3:08 CR 30066-001-GPM—**G. Patrick Murphy**, *Judge.*

ARGUED SEPTEMBER 11, 2009—DECIDED JANUARY 11, 2010

Before EASTERBROOK, *Chief Judge,* and POSNER and WOOD, *Circuit Judges.*

WOOD, *Circuit Judge.* Kevin Cooper was a heroin dealer who operated out of the Centralia area in southern Illinois. Eventually the police caught up with him, and he was charged and convicted of conspiring to distribute and possess with intent to distribute more than 100 grams of heroin, in violation of 21 U.S.C. § 846. On appeal, he challenges both his conviction and his sentence. He asserts that he is entitled to a new trial because of the way that the district court handled his request for self-representation,

the fact that he was shackled throughout the trial, and the court's failure to exclude certain inflammatory evidence. Even if the conviction stands, he argues, his life sentence was unreasonable, because the court placed too much weight on various deaths that were attributable to his heroin sales. Although we are inclined to agree with Cooper that some errors were made, we are satisfied that they were harmless. We therefore affirm.

**I**

The Centralia police first learned about Cooper and his drug trafficking activities in late 2005. Two years later, police officials caught a lucky break when they arrested Brandon Shelton, a heroin addict, for shoplifting. Shelton volunteered to help the police by purchasing drugs from Cooper. They gave him $600 in prerecorded currency and monitored him while he went to a trailer that Cooper used. Shelton entered and emerged 10 minutes later with 1.7 grams of heroin. Shelton promptly turned the heroin over to the police officers in charge. Other officers then entered the trailer, where they found Cooper and two other people. They searched the trailer and found drug paraphernalia and a small amount of heroin. A search of Cooper turned up the prerecorded cash that Shelton had used. The police then arrested Cooper, and in April 2008 he was indicted on the federal charges mentioned earlier.

Initially, Cooper proceeded with an appointed lawyer, Rodney Holmes. Apparently he was unhappy with Holmes, and so at a pretrial hearing held on June 18, 2008, he asked the court to dismiss Holmes and to permit him

to proceed *pro se*. Although the court did not explore Cooper's reasons for his dissatisfaction with Holmes, it did ask him a series of questions relating to his request for self-representation. Included among those questions were inquiries about his understanding of the charges against him, his knowledge of possible penalties, any experience he had with self-representation, his education, and his knowledge of trial procedures. The court specifically mentioned the Federal Rules of Evidence and warned Cooper that it would not make exceptions on his behalf. It also told Cooper that it would furnish standby counsel to help him with legal questions. Finally, it cautioned Cooper about the risks of representing himself. Cooper, who noted that he had successfully represented himself in state court in a trial involving charges for attempted murder and aggravated battery, assured the court that he understood all of this and wanted to proceed on his own. The court never mentioned to Cooper that his legs might be shackled.

Although the record does not reflect why, Cooper's legs were shackled throughout the three-day trial. In order to conceal this fact from the jury, Cooper sat at a skirted table. He stood only when the jury entered and left the court-room. Otherwise, to ensure that the jury did not see the shackles, he avoided moving around while questioning witnesses. He was unable to approach the bench when handling exhibits, and he gave his opening and closing arguments from a seated position.

At the trial, the government introduced a number of witnesses who testified that they had purchased heroin from Cooper, or that they had sold heroin to him, or that

they had seen him selling to others. In general, it was the testimony from these witnesses that established Cooper as someone who had dealt in at least 100 grams of heroin, not just the 1.7 grams that Shelton had bought. These witnesses were themselves heavily involved in drugs, and many testified in the hope of securing lenience for themselves. The prosecutor also put the officers who were involved with Cooper's arrest on the stand. A forensic expert identified the substance that Shelton had purchased and the additional material found within the trailer as heroin. Finally, some cell phone records were introduced into evidence.

Some of the evidence was highly prejudicial to Cooper. Before trial, fearing that the government might bring up the fact that some of his buyers had died from heroin overdoses, Cooper moved to exclude autopsy reports of those deaths. The court agreed to do so, but at trial, it permitted the government to make a number of references to the deaths. Cooper objected repeatedly; at one point, referring to two of the fatalities (the Marler brothers), Cooper said " . . . from the autopsy report I read, there's six different types of drugs in the Marler brothers. Any one of them could have killed them. *And as far as all this stuff, the government trying to do now, it's more prejudicial than probative.*" (Emphasis added). This was as clear an objection based on FED. R. EVID. 403 as we normally see from a lawyer, and it was more than enough to preserve this point for appellate review.

The government managed to introduce evidence that not only the Marler brothers, but also Larry Burton, Brian Goodspeed, Newt Castellari, and Jessica Alsept had all

died from heroin that Cooper sold to them. The court permitted another witness—someone who had been convicted of a drug-induced homicide—to testify about the fact that death could result from an overdose. When Cooper again objected, the government justified the inquiry by saying that it helped to show that he was distributing heroin and also that it showed the effect of that heroin. The court expressed concern about the relevance of the "effects" evidence and offered to give a limiting instruction. In the end, it did not follow up on that offer. Throughout these discussions the court was focusing only on the relevance of the evidence. It never addressed Cooper's objection based on prejudicial impact. Indeed, later the court permitted two witnesses to testify about Cooper's lack of remorse over the deaths. One witness recounted that Cooper said that he would have left one person's "body in a ditch."

Cooper called only two witnesses in his defense. The first was Allen Falls, who testified that he had performed landscape work with Cooper between April and August of 2007. Apparently Cooper was hoping to use Falls as an alibi witness, but if that was what he was doing, the effort was a flop. On cross-examination, Falls admitted that he had never been in Centralia with Cooper. The other witness was Amanda Dodillet, who had been with Cooper on the day of his arrest. On direct examination by Cooper, obviously under oath, Dodillet testified that Cooper had not sold heroin to her. She changed her story on cross-examination, however, and admitted that Cooper had given heroin to her as many as 40 to 50 times. The court eventually concluded that Cooper had pressured her to lie on direct.

After the jury convicted Cooper, the court ordered the preparation of a Presentence Investigation Report ("PSR"). The PSR assigned him a base offense level of 30, relying on evidence that he had handled between 700 grams and one kilogram of heroin. See U.S.S.G. § 2D1.1(c)(5). Four levels were added for his role in the offense, and then two more for obstruction of justice, bringing the total offense level up to 36. But the PSR writer concluded that Cooper was a career offender, see U.S.S.G. § 4B1.1(b), and so that was the guideline that dictated his final offense level (37) and his criminal history (VI). This produced a recommended guidelines range of 360 months to life.

At the sentencing hearing, the court heard victim-impact evidence from family members of those who had died from the overdoses. The government requested a life sentence, emphasizing the high cost of Cooper's criminal activity. The court properly noted that the guidelines are advisory and that it had discretion to impose a sentence as low as 10 years, but it then left no doubt about the way in which it wanted to exercise its discretion, saying "if there were no guidelines and if I have unfettered discretion, I would give you life." It justified that decision on several grounds. First, it noted that "in the teeth of all of this evidence [Cooper] still refuses to acknowledge what is eminently clear to any objective observer and that is that he just is guilty." It then acknowledged that a sentence should be no more than is necessary to accomplish the objectives of sentencing, but it found "the nature and the circumstances of this crime . . . startling." The court also found that Cooper (who was by then in his mid-50s) was incorrigible, and that anything less than a life sentence might make

him think that he could get away with something. Putting that point in terms of 18 U.S.C. § 3553(a), the court was essentially saying that a life sentence was necessary to reflect the seriousness of Cooper's offense, to provide adequate deterrence, and to protect the public from him in the future. On that basis, the court imposed a life sentence, and Cooper filed an immediate notice of appeal.

## II

### A

Cooper has offered three reasons why, in his view, we should vacate his conviction and order a new trial: first, he contends that the district court failed to warn him properly about the dangers of self-representation; second, he argues that the court denied him a fair trial when it allowed him to be shackled during the entire proceeding (especially because, at the same time, he was trying to represent himself); and third, he urges that the trial was irreparably tainted by the court's admission of the evidence of the five fatal overdoses. We address these in turn.

1. *Self-representation.* Although the Sixth Amendment guarantees criminal defendants a right to counsel, it has been established at least since the Supreme Court's decision in *Faretta v. California*, 422 U.S. 806 (1975), that "the right to self-representation—to make one's own defense personally—is thus necessarily implied by the structure of the Amendment." *Id.* at 819; *cf. Martinez v. Court of Appeal of Cal., Fourth App. Dist.*, 528 U.S. 152 (2000) (holding that the *Faretta* right extends only to the trial

phase, and does not include a right to self-representation on a direct criminal appeal). A defendant's decision to waive her Sixth Amendment right to counsel is valid, however, only if the waiver is knowing and intelligent. *Faretta,* 422 U.S. at 835; *Smith v. Grams,* 565 F.3d 1037, 1044 (7th Cir. 2009).

Although district judges are not required to expound at length on the disadvantages of self-representation, nor are they required to give a hypothetical lecture on criminal law, see *United States v. Moya-Gomez,* 860 F.2d 706, 732 (7th Cir. 1988), they do need to take reasonable steps to ensure that a defendant's decision to proceed without counsel is knowing and informed. When someone like Cooper argues, in effect, that the district court did not do enough to save him from himself, we evaluate that contention with the help of a number of useful inquiries. They include (but are not necessarily limited to) the following: "(1) whether and to what extent the district court conducted a formal hearing into the defendant's decision to represent himself; (2) other evidence in the record that establishes whether the defendant under-stood the dangers and disadvantages of self-representation; (3) the background and experience of the defendant; and (4) the context of the defendant's decision to waive his right to counsel." *United States v. Todd,* 424 F.3d 525, 530 (7th Cir. 2005) (quoting *United States v. Avery,* 208 F.3d 597, 601 (7th Cir. 2000)). We review the district court's decision for abuse of discretion. *Todd*, 424 F.3d at 530.

In this case, most of those points were brought out in the district court's discussion with Cooper when Cooper

asked to dismiss his lawyer. As we have noted, the court gave Cooper a sense of what he needed to know; it elicited from Cooper the fact that he had experience with self-representation; it warned Cooper of the risks of proceeding without counsel; and it was able to see for itself that Cooper was firmly committed to that method of proceeding. The court was under no obligation in this connection to tell Cooper that he might be shackled, and that shackling would impede his ability to walk around while he conducted the trial. We conclude, therefore, that the court did not abuse its discretion when it permitted Cooper to represent himself, and that Cooper must be held to the choice he made.

2. *Shackling.* The decision whether to shackle a defendant is one that a court must make on grounds that have nothing to do with his right to self-representation. On the one hand, a criminal defendant has the right to a presumption of innocence. See *Estelle v. Williams,* 425 U.S. 501 (1976); *Illinois v. Allen,* 397 U.S. 337 (1970); see also *United States v. Van Sach,* 458 F.3d 694, 699 (7th Cir. 2006). The defendant thus has the right to appear before the jury free from restraints or garb that imply that he is a dangerous or guilty person. *Allen,* 397 U.S. at 344; *Roche v. Davis,* 291 F.3d 473, 483 (7th Cir. 2002). On the other hand, the Supreme Court has held that "[t]he law has long forbidden routine use of visible shackles during the guilt phase; it permits a State to shackle a criminal defendant only in the presence of a special need." *Deck v. Missouri,* 544 U.S. 622, 626 (2005). The right to be free from visible shackles, however, "may be overcome in a particular instance by essential state interests such as physical

security, escape prevention, or courtroom decorum." *Id.* at 628.

Cooper's biggest problem with respect to this argument is that he failed to raise it before the district court. Both parties assume that this was a forfeiture, rather than a waiver, and thus that we may review the point for plain error. *United States v. Luepke,* 495 F.3d 443, 448 (7th Cir. 2007). Although the Supreme Court follows a different rule for cases in which a defendant fails to object to prison garb, see *Estelle v. Williams,* 425 U.S. 501, 512-13 (1976) (holding that "the failure to make an objection to the court as to being tried in such clothes . . . is sufficient to negate the presence of compulsion necessary to establish a constitutional violation"), the overall tenor of *Deck* (a case in which counsel did object to shackling) suggests that shackling is a much more serious step than the use of prison garb. The Court saw nothing even potentially benign in shackles, nor did it suggest that a jury might feel sympathy rather than fear or aversion for a shackled defendant.

In any event, the government made no effort to equate shackling to prison garb in this case, and so we proceed with plain-error review. The Supreme Court's most recent statement of the plain error standard appears in *Puckett v. United States,* 129 S.Ct. 1423 (2009):

> . . . [Federal] Rule [of Criminal Procedure] 52(b) re-view—so-called "plain-error review"— involves four steps, or prongs. First, there must be an error or defect—some sort of deviation from a legal rule—that has not been intentionally relinquished or abandoned,

*i.e.*, affirmatively waived, by the appellant. Second, the legal error must be clear or obvious, rather than subject to reasonable dispute. Third, the error must have affected the appellant's substantial rights, which in the ordinary case means he must demonstrate that it affected the outcome of the district court proceedings. Fourth and finally, if the above three prongs are satisfied, the court of appeals has the discretion to remedy the error—discretion which ought to be exercised only if the error seriously affects the fairness, integrity or public reputation of judicial proceedings. Meeting all four prongs is difficult, as it should be.

129 S.Ct. at 1429 (internal citations and quotation marks omitted).

Here, even if we assume that the district court erred when it failed to make any findings about the need to place Cooper in shackles, we see nothing in the record that would establish either that the shackling was a clear or obvious violation of his rights or that it affected the outcome of the proceedings. Critically, these were not *visible* shackles. The record indicates instead that the jury could not see the shackles, because Cooper was sitting at a skirted table, rendering his ankles invisible. The government's table was similarly skirted, and so the jury would have had no reason to draw any adverse inference from the appearance of the defense table. Cooper's standby lawyer was sitting right next to him, and so the shackling did not impede his access to legal advice. Cooper now complains that he could not move around the courtroom, but he never asked for permission to do so, and

so there is no way to know how the district court might have accommodated any such request. Although it is regrettable that the court did not explain the shackling decision, we find no plain error.

3. *Evidence of Fatal Overdoses.* By far the most serious argument that Cooper raises is that the district court abused its discretion when it failed to subject the government's evidence showing that a number of Cooper's customers died after using heroin that they had purchased from him to analysis under FED. R. EVID. 403. The fault was not Cooper's; the excerpt we have included above shows that Cooper properly objected to this evidence, not because it failed the relevance standard of FED. R. EVID. 401, but because, even if relevant, it was subject to exclusion under Rule 403 because "its probative value [was] substantially outweighed by the danger of unfair prejudice . . . ." When the court overruled Cooper's objections, however, it repeatedly said only that the evidence was relevant; as far as we can tell it never considered whether it was nonetheless so prejudicial that it should be limited or excluded entirely. The government argued that the evidence was admissible to show that Cooper had indeed distributed heroin to those who overdosed. The court's ruling suggests that it accepted this reason: "Yes, if that is the testimony [that the heroin used by certain overdose victims came from Cooper], of course it would be relevant for that purpose [*i.e.* to show that Cooper was distributing]." Later, however, the court went further, and ruled that "[t]he defendant's statements and his reactions to the death of someone which connects him with the heroin is relevant also." Although the court offered at several points to give

a limiting instruction, Cooper did not follow up on that invitation, and so no such instruction was ever given.

Even taking into account the fact that our review of evidentiary rulings is for abuse of discretion, we cannot escape the conclusion that the court erred by allowing the government to explore this line of inquiry. As we have already noted, the court also erred by failing altogether to conduct a Rule 403 analysis, which was part of the process that it had no discretion to omit. Evidence of what happened to Cooper's customers after they bought heroin from him had nothing to do with the charges in this case. The government relies on *United States v. Birbal*, 62 F.3d 456 (2d Cir. 1995), to support the court's ruling, but that case is weak authority at best for its position. In *Birbal*, the district court had permitted the prosecutor to elicit evidence showing that one of Birbal's customers, Buckley, had died of a heroin overdose soon after purchasing the drug. *Id.* at 463. The court found that this evidence was "inexorably intertwined" with the question whether Birbal and his partner had distributed the narcotics, 62 F.3d at 463, and thus that it had no need to consider Rule 403. The Second Circuit concluded that the latter point was wrong: Rule 403 applies to all evidence, no matter how closely related to the criminal activity it may be. *Id.* at 464. Nevertheless, the court thought, the probative value of the evidence outweighed its obvious prejudicial effect. *Id.* The evidence provided strong circumstantial proof that it was heroin that Birbal had given to Buckley, since it was shortly after Birbal left Buckley's house that Buckley began to exhibit symptoms of heroin poisoning. *Id.* Moreover, the court concluded that Birbal had not made a specific

enough objection to the evidence in question. *Id.* at 464-65. All told, both the facts and legal posture of *Birbal* are sufficiently distinct from Cooper's case that there is ample room for different outcomes.

The fact that there was an error in the admission of evidence, however, is not the end of the matter. Evidentiary errors are subject to harmless error analysis under FED. R. CRIM. P. 52(a). *Neder v. United States*, 527 U.S. 1, 7 (1999). Rule 52(a) states that "[a]ny error, defect, irregularity, or variance that does not affect substantial rights must be disregarded." When we have considered evidentiary questions like the one before us, we have held that "[t]he test for harmless error is whether, in the mind of the average juror, the prosecution's case would have been significantly less persuasive had the improper evidence been excluded." *United States v. Emerson,* 501 F.3d 804, 813 (7th Cir. 2007) (quoting *United States v. Owens,* 424 F.3d 649, 656 (7th Cir. 2005) and *United States v. Eskridge,* 164 F.3d 1042, 1044 (7th Cir. 1998)) (internal quotation marks omitted). Cooper stood charged with one count of conspiracy to distribute and possess with intent to distribute more than 100 grams of heroin. The jury heard witness after witness testify that they had bought heroin from, or sold heroin to, Cooper. The government's informant, Shelton, conducted one monitored purchase. Cooper's companion, Dodillet, eventually admitted that she had obtained heroin from him 40 to 50 times. Even though the jury was probably repulsed by the evidence of Cooper's callousness about the consequences of his sales, the evidence supporting the charge in the case was overwhelming. We cannot imagine that any juror would have

found the government's case less persuasive if all of that evidence had been excluded.

We therefore hold that the district court's error was harmless. That said, we must note that it is regrettable that the government tried to use this explosive evidence at the guilt stage in the first place. There is no question that it would have been admissible during the sentencing proceeding, since it throws light on the nature and circumstances of Cooper's offense, and his history and characteristics. See 18 U.S.C. § 3553(a)(1). Had the evidence of the underlying offense been weaker, the government would have imperiled its prosecution for no good reason.

B

We can be brief with Cooper's challenge to his life sentence. In keeping with the Supreme Court's instruction in *Gall v. United States*, 552 U.S. 38 (2007), and *Rita v. United States*, 551 U.S. 338 (2007), we first examine whether the district court correctly calculated the defendant's advisory guideline range. Next, we ensure that the court otherwise followed proper procedures, in particular by giving the defendant an opportunity to raise whatever points under 18 U.S.C. § 3553(a) that he thought pertinent. We also consider whether the district court gave enough of an explanation of its ultimate choice of sentence to permit meaningful appellate review. In short, we evaluate the procedural soundness of the sentencing decision. If all is well procedurally speaking, we then ask whether the sentence chosen by the district court is substantively reasonable. At the appellate level, we are entitled to give a

presumption of reasonableness to a sentence that falls within a properly calculated guideline range. *Rita,* 551 U.S. at 350-51.

Although Cooper complains that the district court took into account overdoses that occurred as far back as 1999, he does not suggest that the judge was forbidden by any law to do so. Nor is there any such prohibition. The rules of evidence do not apply during sentencing proceedings; the only requirement is that the evidence supporting the sentence must be reliable. *United States v. Statham,* 581 F.3d 548, 553 (7th Cir. 2009). Cooper also suggests that the district court allowed its irritation with Cooper's self-representation to influence the sentence—at one point the judge told Cooper "you are going to die in prison"—and that this was impermissible. But this argument overlooks the judge's explanation for his decision to sentence Cooper at the top of the properly calculated guideline range, which was life. The court was not required to flatter Cooper; instead, it had every right to tell Cooper (even bluntly) that he was getting a life sentence because the judge found that this was what his many years of crime had earned him.

Cooper has raised other arguments against his sentence, but none of them is enough to show that the sentence was substantively unreasonable.

*   *   *

We AFFIRM the judgment of the district court in all respects.