In the

# United States Court of Appeals

## For the Seventh Circuit

No. 17-2994

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

NATHAN DRIGGERS,

*Defendant-Appellant.*

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 15 CR 350 — **John J. Tharp, Jr.**, *Judge.*

ARGUED SEPTEMBER 21, 2018 — DECIDED JANUARY 16, 2019

Before WOOD, *Chief Judge*, and FLAUM and HAMILTON, *Circuit Judges*.

WOOD, *Chief Judge*. In the wee hours of the morning on April 12, 2015, thieves stole approximately 104 Ruger firearms from a train sitting in a Chicago railyard. Later that day, according to the government, Nathan Driggers purchased 30 of those stolen guns. He wound up facing charges of being a felon in possession of a firearm in violation of 18 U.S.C. § 922(g), and possession of a stolen firearm in violation of 18

U.S.C. § 922(j). Driggers proceeded to trial, and a jury returned a split verdict, finding him guilty of being a felon in possession of a firearm, but not guilty of possessing a stolen firearm. Driggers now appeals his conviction. He argues that the district court improperly allowed testimony about his co-defendant Warren Gates and gave an erroneous jury instruction on joint possession. Finding no error in the district court's decisions, we affirm Driggers's conviction.

## I

On April 12, 2015, eight men entered a Chicago railyard, broke into a cargo train parked there, and discovered a cache of Ruger firearms being shipped from a factory in New Hampshire to a distributor in Washington State. By the end of the night, these men had stolen over 100 guns.

The government did not accuse Driggers of participating in the actual robbery. Instead, its theory (supported by the testimony of one of the robbers, Marcel Turner) was that Terry Walker, another of the robbers, contacted Driggers shortly after the heist to set up a sale of the stolen guns. The same day, Turner and Walker took approximately 30 of the stolen firearms to Driggers's store. They met Driggers there, at which point Driggers and Walker briefly haggled over the price of the guns and then consummated the sale. Though Turner did not know how much Driggers ultimately paid for the 30 guns, Turner received $1,700 for the six guns that comprised his share.

The government's other trial evidence attempted to corroborate Turner's account of the gun sale. One inconvenient fact for the prosecution was that Driggers was not on the lease for the store where the gun sale allegedly occurred. But

testimony from Driggers's landlord and property manager established that, despite his absence from the lease, the store did in fact belong to him. Their testimony showed that Driggers co-leased the store month-to-month with another man, Yashmine Odom. Odom was apparently the store's principal occupant, but Driggers paid the rent for the most part and made at least some repairs.

Additionally, police searched Driggers's store during their investigation, and ATF Agent Jason Vachy described that search in detail at trial. He explained that the agents found a hodgepodge of merchandise (some of which appeared to be stolen), various personal documents and items belonging to Driggers and Odom, and a gun hidden in a tire in the backroom. That gun's serial number matched one of the guns stolen during the train robbery. There was a fingerprint on that gun, but it did not come from Driggers.

The government also presented trial testimony and phone records that showed that shortly after Driggers allegedly purchased the 30 stolen guns, he contacted Warren Gates, a co-defendant who pleaded guilty. Before Driggers's trial, Gates admitted to possessing 17 of the guns from the train robbery. Notably, during the first four months of 2015, there were zero contacts between Driggers's and Gates's cell phones, but shortly after the train robbery, there were 46 such contacts. Police searched Gates's storage units and found six of the stolen guns. Gates confessed to possessing these guns and further admitted that he had purchased them, as well as 11 others from the train robbery. In his own case, Gates stated that he purchased those guns from two of the robbers, Elgin Lipscomb and Alexander Peebles; in Driggers's case, the prosecution argued that Gates had bought them from Driggers. The

government further urged that the jury could infer from Driggers's contacts with Gates and Gates's gun purchases that Driggers possessed and sold guns from the train robbery.

## II

### A

As we indicated, Driggers raises only two points on appeal: one about the admission of testimony concerning Gates, and the other about the joint-possession jury instruction. We begin with the latter.

Driggers does not assert that the joint-possession instruction used by the district court misstated the law. Instead he argues that the court should not have included the instruction because neither party's theory of the case involved joint possession, and so it only served to confuse the jury.

We review a district court's decision to give a jury instruction for abuse of discretion. *United States v. Tanner*, 628 F.3d 890, 904 (7th Cir. 2010). A joint-possession instruction is proper where "[t]here was substantial evidence that more than one person could have possessed the gun." *United States v. Rainone*, 816 F.3d 490, 494 (7th Cir. 2016). Indeed, we have gone so far as to say that "a joint possession instruction is '*necessary*' when contraband is recovered from a jointly-occupied residence." *Id.* (quoting *United States v. Lawrence*, 788 F.3d 234, 246 (7th Cir. 2015)) (emphasis added).

Driggers is correct that the government primarily focused on his alleged purchase and subsequent sole possession of the stolen guns. But he ignores the fact that the jury had before it evidence that he and Odom jointly possessed the firearm that the officers found in his store. Driggers co-leased the store with Odom, and both Driggers's and Odom's personal

effects—including mail, a birthday card, and bank statements—were found there. The owner and the property manager of the store also testified that they observed both Driggers and Odom exhibiting control over the store, such as by making rent payments or offering to make repairs.

Given the substantial personal effects addressed to both Driggers and Odom found within the store, as well as the testimony suggesting that both occupied the store, there was ample basis for a joint-possession instruction. The district court acted well within its discretion to provide the jury this guidance.

B

Driggers also complains that the introduction of evidence about his contacts with Gates, including the evidence about the guns from the train robbery found in Gates's storage locker, was improper. He first argues that the evidence was irrelevant under Federal Rule of Evidence 401. In addition, he asserts that the court's decision to admit the evidence violated his due process rights, because the government offered inconsistent theories about how Gates obtained the guns. A "district court has 'wide discretion' when it rules on the admission of evidence." *United States v. Boros*, 668 F.3d 901, 907 (7th Cir. 2012). We thus review "a district court's decision to admit or exclude evidence for abuse of discretion." *Id.* We review the question whether a defendant's due process rights were violated *de novo*. See *United States v. Kielar*, 791 F.3d 733, 736 (7th Cir. 2015).

In fact, Driggers's Rule 401 argument and his due process argument are intertwined. The potential relevance of any evidence regarding Gates could be limited because, based on the

government's contentions in Gates's own prosecution, it appears that Driggers did not sell Gates any of the particular guns Gates was prosecuted for possessing. On the other hand, if Driggers had sold any of the guns he allegedly bought from the train robbers to Gates, evidence about the contacts between Driggers and Gates, as well as the fact that those guns were found in Gates's possession, would have been highly relevant.

In either scenario, the district court did not abuse its discretion in finding that the Gates evidence passed the threshold for Rule 401. The standard for relevance is low. *Tennard v. Dretke*, 542 U.S. 274, 284–85 (2004). When determining whether evidence is relevant, we ask only whether it has "'any tendency to make a fact more or less probable than it would be without the evidence' [when] 'the fact is of consequence in determining the action.'" *Boros*, 668 F.3d at 907 (quoting FED. R. EVID. 401). Even if Driggers did not directly sell Gates the guns police found in Gates's storage locker, the fact that Driggers had 46 contacts with a known buyer of stolen guns immediately after he allegedly bought 30 stolen guns supported the government's theory that Driggers served as the robbers' fence. This flurry of contacts was additionally suspicious because Driggers and Gates were not in contact at all during the four months preceding the robbery. The district court thus did not abuse its discretion in finding that this evidence satisfied Rule 401.

Before turning more directly to the due-process argument, we explain how the Gates prosecution differed from the case against Driggers. The government first proceeded against Gates; that case was resolved with a plea agreement. In that agreement, Gates admitted that he "purchased approximately

seventeen of the firearms [from the train robbery] from co-defendants PEEBLES and LIPSCOMB on or after April 13, 2015." Plea Agreement at 3, *United States v. Gates*, No. 1:15-cr-350-3 (N.D. Ill. July 19, 2016), ECF No. 173 (capitalization in original). Gates also admitted that at the time the officers searched his storage units, he kept 13 firearms in those units, six of which he had bought from Peebles and Lipscomb and "seven additional firearms unrelated to the train theft." *Id.* This version of the offense—that Gates purchased 17 firearms from Peebles and Lipscomb, with officers recovering six of those 17 guns from Gates's storage units—was repeated by both ATF Agent Vachy in Gates's Presentence Investigation Report and by the prosecution in Gates's sentencing memorandum.

By contrast, in Driggers's prosecution, the government represented to both the district court and to the jury that the guns it had previously contended Gates bought from Peebles and Lipscomb were in fact sold to him by Driggers. The government has not explained to us (or to anyone else) how these two conflicting factual representations can coexist, and we are at a loss to reconcile them.

The question is thus what to do about this inconsistency. The circuits are split on the question whether the prosecution's use of inconsistent theories in multiple prosecutions violates due process. Compare *United States v. Frye*, 489 F.3d 201, 214 (5th Cir. 2007) ("[A] prosecutor can make inconsistent arguments at the separate trials of codefendants without violating the due process clause."), with *Smith v. Groose*, 205 F.3d 1045, 1049–52 (8th Cir. 2000) (agreeing with the Ninth Circuit that "inconsistent prosecutorial theories can, in certain circumstances, violate due process rights"); see also *Bradshaw v. Stumpf*, 545 U.S. 175, 190 (2005) (Thomas, J. concurring) ("This

Court has never hinted, much less held, that the Due Process Clause prevents a State from prosecuting defendants based on inconsistent theories."). Though several litigants have raised this argument before us, we have thus far declined to choose a side in this matter. We have not needed to address the constitutional issue because the defendants who have advanced this theory were either not prejudiced by the prosecution's behavior, see *United States v. Flournoy*, 842 F.3d 524, 530 (7th Cir. 2016), or because the government did not actually "take fundamentally opposite positions in its two prosecutions." *United States v. Presbitero*, 569 F.3d 691, 702 (7th Cir. 2009). We likewise take a pass here, because Driggers was not prejudiced by the government's actions.

A defendant is entitled to a new trial only when "there is a reasonable possibility that the trial error had a prejudicial effect on the jury's verdict." *Flournoy*, 842 F.3d at 530. Here, there is a simple reason that the Gates evidence was not prejudicial to Driggers: the jury acquitted him of the possession of a *stolen* firearm charge that the Gates evidence supported. Even if we totally disregard the Gates evidence, as well as the other testimony and argument it bolstered, there is still sufficient evidence to support the jury's verdict on the other charge. This is because the jury could find Driggers guilty of being a felon in possession based solely on the gun found in his store—a gun that had no connection to Gates. See *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) ("Once a defendant has been found guilty of the crime charged, the factfinder's role as weigher of the evidence is preserved through a legal conclusion that upon judicial review *all of the evidence* is to be considered in the light most favorable to the prosecution."). As we noted earlier, Driggers's connection to, and control over, the store was strongly supported by the evidence. The gun

was found hidden in a tire in the store's backroom. This was enough to permit the jury to convict Driggers of being a felon in possession of a firearm in violation of 18 U.S.C. § 922(g).

For purposes of that count, it did not matter whether the gun was stolen. And apparently the jury was not convinced that Driggers knew, for purposes of the other count (under 18 U.S.C. § 922(j)), that the gun in his store came from the train robbery, because it acquitted him on that charge. Even if the government's theories in the Gates prosecution were inconsistent with those it used against Driggers, there is thus no reasonable possibility that this tactic created a prejudicial effect on the jury's verdict.

### III

Because the district court did not improperly instruct the jury, and because Driggers suffered no prejudice from any error that may have existed in the treatment of the Gates evidence, we AFFIRM Driggers's conviction and sentence.